IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 12, 1999 Session

## MARIE HAWKS v. MICHAEL C. GREENE, COMMISSIONER OF TENNESSEE DEPARTMENT OF SAFETY

**Appeal from the Chancery Court for Davidson County**
**No. 98-1320-III     Ellen Hobbs Lyle, Chancellor**

_____

**No. M1999-02785-COA-R3-CV -Filed December 18, 2001**
_____

The Tennessee Department of Safety, appellant, seeks review of the decision of the Chancery Court for Davidson County reversing the State's order forfeiting the vehicle owned by Ms. Marie Hawks, appellee. Because we find that forfeiture of the van, under the facts of this case, constitutes an excessive fine, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which Ben H. Cantrell, P.J, M.S., joined.
WILLIAM C. KOCH, JR., filed a concurring opinion.

Paul G. Summers, Attorney General and Reporter, Paula D. Godsey, Assistant Attorney General, for the appellant, Michael C. Greene, Commissioner of Tennessee Department of Safety.

Fletcher W. Long, Nashville, Tennessee, Wesley MacNeil Oliver, New Orleans, Louisiana, for the appellee, Marie Hawks.

### OPINION

On April 25, 1996, Ms. Hawks's driver license was revoked by the Tennessee Department of Safety ("the Department") as the result of a DUI conviction on March 28, 1996. Although she became eligible to reinstate her license or apply for a new license one year after the revocation, she did not do so until December of 1997.

On September 10, 1997, while at work, Ms. Hawks received information that her one year old child was sick and running a high fever. She left work and received another page that her five year old son, at school, was also sick and had to be picked up. On her way to pick up her sick

children to take them to the doctor, Ms. Hawks was stopped for speeding by the Lakewood Police. When asked to produce her driver license, Ms. Hawks told the police officer that she did not have a license as it had been revoked. Later, Ms. Hawks stated that, although she was aware that her license had been revoked, she had been driving in order to hold a job. She viewed the job as an opportunity to improve her family's situation and to raise the money necessary to pay the costs and fees necessary to obtain a new or reinstated license. Ms. Hawks resided in a subsidized housing project, has four children and has no other family residing in Nashville.

On September 16, 1997, the Department issued a forfeiture warrant pursuant to Tenn. Code Ann. § 55-50-504(h)(1). On December 19, 1997, Ms. Hawks ultimately paid the fees for a new license and completed the other necessary steps. She was issued a new license.

A hearing on the forfeiture was held before an administrative law judge ("ALJ"). Ms. Hawks was not represented by counsel at the hearing. After considering the evidence, the ALJ ordered forfeiture of Ms. Hawks's van, and Ms. Hawks filed a petition for review to the Chancery Court. Upon review, the trial court reversed the ALJ's order of forfeiture ruling that the forfeiture violated the Excessive Fines Clauses of the United States and Tennessee Constitutions. This appeal followed.

I.

Decisions of administrative agencies are reviewed by courts under the standard established in the Tennessee Administrative Procedures Act. Tenn. Code Ann. § 4-5-322 (1998). Generally, the court's review is limited to the record, and the court's authority to reverse an agency decision is limited to specific situations set out by statute. Tenn Code Ann. § 4-5-322(g) and (h). The trial court herein reversed the Department's forfeiture decision because it found, pursuant to Tenn. Code Ann. § 4-5-322 (h)(1), that "the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are in violation of constitutional or statutory provisions." Because the trial court's determination that the forfeiture violates the constitutional prohibition on excessive fines presents a question of law, our review is *de novo*. "[T]he question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate." *United States v. Bajakajian*, 524 U.S. 321, 336-37, n.10, 118 S. Ct. 2028, 2037-38 n.10 (1998).

The forfeiture of Ms. Hawks's vehicle was ordered pursuant to Tenn. Code Ann. § 55-50-504(h), which provides:

(1) The vehicle used in the commission of a person's violation of § 55-50-504, when the original suspension or revocation was made for a violation of § 55-10-401[DUI], or a statute in another state prohibiting driving under the influence of an intoxicant, is subject to seizure and forfeiture in accordance with the procedure established in title 40, chapter 33, part 2. The department is designated as the applicable agency, as defined by § 40-33-202, for all forfeitures authorized by this subsection.

(2) For purposes of clarifying the provisions of this subsection and consistent with the overall remedial purpose of the asset forfeiture procedure, a vehicle is subject to seizure and forfeiture upon the arrest or citation of a person for driving while such person's driving privileges are cancelled, suspended, or revoked. A conviction for the criminal offense of driving while such person's driving privileges are cancelled, suspended or revoked is not required.

There is no dispute that Ms. Hawks was previously convicted of violation of Tenn. Code Ann. § 55-10-401 and that her driver license had originally been revoked for that violation. There is, however, dispute about the interpretation and application of Tenn. Code Ann. § 55-50-504, a violation of which is a prerequisite to forfeiture by the explicit terms of the forfeiture statute.

Tenn. Code Ann. § 55-50-504(a)(1) defines the offense in question as driving on public ways "at a time when the person's privilege to do so is canceled, suspended or revoked because of a conviction for . . . driving while intoxicated under § 55-10-401. . . ." Thus, to subject a vehicle to forfeiture, the driver must be driving at a time when his or her license "is" revoked because of a DUI conviction.

The initial question presented by these statutes, by the trial court's holding, and by Ms. Hawks's argument is whether a person whose license has in the past been revoked for driving while under the influence of intoxicants violates Tenn. Code Ann. § 55-50-504(a)(1) by driving without a license regardless of the length of time which has elapsed between the revocation and the subsequent offense. An analysis of this question requires an examination of the statutory scheme governing the privilege of driving on Tennessee's public ways.

II.

We begin with the basic requirement that, in order to drive a motor vehicle on the highways in the state, a person must have a valid driver license issued by the Department. Tenn. Code Ann. § 55-50-301. A driver may lose his or her license for various reasons, and only the Department may revoke or suspend a license. Tenn. Code Ann. § 55-50-502; *Wilson v. State*, 197 Tenn. 17, 19, 270 S.W.2d 340, 341 (1954) (while a trial court is required to prohibit someone convicted of driving under the influence from driving for a specified term, that prohibition does not constitute a revocation of the person's license, and the Department has authority to revoke a license); *State v. Loden*, 920 S.W.2d 261, 264 (Tenn. Crim. App. 1995) (a trial court does not have authority to revoke a driver license).

The Department is statutorily required to revoke a license upon receipt of evidence that the licensee has been convicted of specified offenses, including driving while under the influence of an intoxicant. Tenn. Code Ann. § 55-50-501(a)(2). Nothing in this mandatory revocation statute establishes a specific duration for the revocation. However, Tenn. Code Ann. § 55-50-102(42) defines "Revocation of driver license" as:

the termination by formal action of the department of a person's driver license or privilege to operate a motor vehicle on the public highways, which termination shall not be subject to renewal or restoration except that an application for a new license may be presented and acted upon by the department after the expiration of at least one (1) year after the date of revocation.

Thus, the statute establishes a mandatory duration of revocation of one year,[1] during which the former licensee is ineligible for reinstatement of a license or issuance of a new license.[2] In addition, Tenn. Code Ann. § 55-10-403(a)(1) requires the sentencing court to enter an order prohibiting a person convicted for the first time of DUI from driving a vehicle in the State for a period of one year. In Ms. Hawks's case, she had been convicted of DUI on March 28, 1996, and her license was revoked by the Department pursuant to that conviction on April 25, 1996. She was stopped for speeding and charged with driving on a revoked license on September 10, 1997, obviously a time outside the mandatory revocation period.

The question is whether Ms. Hawks was driving "at a time when" her driving privilege was revoked because of her DUI conviction, per Tenn. Code Ann. § 55-50-504(a)(1). Ms. Hawks asserts that, after the expiration of one year, her license was no longer revoked because of her DUI conviction. The trial court determined that because the one-year revocation for DUI had expired, Ms. Hawks was not driving at a time when her license was revoked because of the DUI conviction. Rather, the court determined that she was driving at a time when her license was canceled, suspended, or revoked (without regard to cause), a separate offense defined in § 55-50-504(a)(1). At the time of the seizure of Ms. Hawks's vehicle, Tenn. Code Ann. § 55-50-504(a)(1) read:

A person who drives a motor vehicle on any public highway of this state at a time when the person's privilege to do so is cancelled, suspended, or revoked commits a Class B misdemeanor. A person who drives a motor vehicle on any public highway of this state at a time when the person's privilege to do so is cancelled, suspended or revoked because of a conviction for vehicular assault under § 39-13-106, vehicular

---

[1]This one-year mandatory revocation conclusion is consistent with other statutes. Tenn. Code Ann. § 55-50-502(f)(3), which provides for application for a new license one year after revocation; Tenn. Code Ann. § 55-50-502(a)(1), which authorizes the Department to suspend a license "upon a showing by its records or other sufficient evidence" that the licensee "has committed an offense for which mandatory revocation of license is required upon conviction," refers to the "time of mandatory revocation." Similarly, Tenn. Code Ann. § 55-50-504(b) provides that if the department receives a record of conviction of a person for driving while a license was revoked for specified reasons, including a DUI conviction, the department "shall extend the revocation for an additional period of one year."

[2]The court may, however, order the issuance of a restricted driver license in certain circumstances. Tenn. Code Ann. § 55-10-403(d).

-4-

homicide under § 39-13-213, or driving while intoxicated under § 55-10-401[3] shall be punished by confinement for not less than two (2) days nor more than six (6) months, and there may be imposed, in addition, a fine of not more than one thousand dollars ($1,000).

The trial court determined that this statute created two offenses, but that the forfeiture statute authorized forfeiture for a violation of either of the offenses if "the original suspension or revocation was made for a violation of" the DUI statute. Tenn. Code Ann. § 55-50-504(h)(1). The court found that Ms. Hawks's vehicle was subject to forfeiture under the statute. Thus, the distinction made by the trial court regarding the specific offense was not determinative to that court of whether Ms. Hawks's van was subject to forfeiture. However, the court did find the distinction important in its excessive fines analysis where the gravity of the offense is a relevant factor.

We agree that Ms. Hawks's vehicle was subject to forfeiture, but do not agree with the trial court's analysis of Tenn. Code Ann. § 55-50-504(a)(1). While we agree that the subsection creates two separate offenses, depending upon the cause for cancellation, suspension or revocation of the license, we can find no basis in the statute for the distinction between driving at a time the license is revoked and driving at a time the license is revoked for one of the enumerated offenses. Additionally, even though Ms. Hawks's argument that once the mandatory revocation time period has expired a person is no longer driving "at a time when" that person's license is revoked (whatever the cause), but instead is driving without a valid license, has some logical appeal, we are nonetheless convinced that this distinction is also not supported by the statutes.

The Department takes the position that a driver's license which is revoked remains revoked until the driver takes the necessary steps to obtain a new license. This position is supported by Tenn. Code Ann. § 55-50-102(42), set out earlier in this opinion.[4] According to that statute, revocation of a driver license is a termination of the holder's privilege to drive on public ways in this state. The statute clearly states that a termination [terminated license] may not be renewed or restored, but that,

---

[3]Tenn. Code Ann. § 55-10-401 actually defines the offense as driving under the influence of intoxicants and drugs.

[4]Tenn. Code Ann. § 55-50-502(f)(3) contains similar language:

Any person whose license or privilege to drive a motor vehicle on the public highways has been revoked shall not be entitled to have such license or privilege renewed or restored unless the revocation was for a cause which has been removed, except that after the expiration of one (1) year or the period of suspension prescribed by a court from the date on which the revoked license was surrendered to and received by the department, such person may make application for a new license as provided by law. . . .

after the mandatory period, a new license may be applied for.[5]  In other words, revocation is a nullification which is without duration.  Once a license is revoked, it remains revoked.

Under that analysis, a person who drives without a license at any time after his or her license has been revoked, whether within or without the mandatory revocation period, commits the offense of driving while the license is revoked, in violation of Tenn. Code Ann. § 55-50-504(a).  This interpretation is consistent with that applied in the context of criminal prosecutions for the offense. Conviction for the criminal offense of driving on a revoked license requires proof of driving on a Tennessee public road at a time when the driver's privilege to do so is canceled, suspended or revoked.  *State v. Green*, 947 S.W.2d 186, 189 (Tenn. Crim. App. 1997).  The second element can be proved by evidence that the license was "on revoked status" at the time of the offense.  *State v. McDonald*, No. 02C01-9206-CR-00126, 1993 WL 312698, at *3 (Tenn. Crim. App. Aug. 18, 1993). For purposes of this offense, a license remains on revoked status from the time it is revoked, regardless of the amount of time involved.[6]  *See State v. Hampton*, No. 03C-01-9503-CR-00107, 1996 WL 366323, at * 2 (Tenn. Crim. App. July 3, 1996) (*perm. app. denied*) (license was revoked in 1986 and defendant was arrested in 1994); *State v. Ake*, No. 01C01-9309-CR-00297, 1995 WL 376724 (Tenn. Crim. App. June 22, 1995) (license revoked March 17, 1989, and offense committed April 30, 1990); *State v. North*, No. 01C01-9312-CC-00418, 1994 WL 474841, at *1 (Tenn. Crim. App. Sept. 1, 1994) (license had been revoked for twelve years, defendant had continued to drive nonetheless, and was convicted for the eighth time for driving on a revoked license).

The reasoning for the conclusion that a license remains revoked until it is renewed is the same as that set out above; the ability to drive a motor vehicle on a public highway is not a right, but is a revocable privilege that is granted upon compliance with statutory licensing procedures.  *State v. Booher*, 978 S.W.2d 953, 956 (Tenn. Crim. App. 1997);  *Goats v. State*, 211 Tenn. 249, 252-53, 364 S.W.2d 889, 891 (1963).  Accordingly, the privilege of driving on Tennessee's highways is not absolute, and that privilege may be revoked.  In a recent opinion dealing with a nonresident's assertion that his possession of a valid license from another state coupled with expiration of the one-year mandatory period of revocation of his Tennessee driver license for conviction of driving under the influence prohibited his conviction for driving on a revoked license, the Court of Criminal Appeals explained:

_____

[5]We note, however, that other statutes speak in terms of "reinstating the driving privileges and/or reissuing a driver license," Tenn. Code Ann § 55-50-303(b), "reissuance of any license revoked because of a conviction," Tenn. Code Ann § 55-50-502(c)(1), and "have such license or privilege renewed or restored," Tenn. Code Ann § 55-50-502(f)(3).  The Department's official records reflect the status of Ms. Hawks's license as "reinstated."  The parties also referred to reinstatement.  We do not think these references change the nature of a revoked license.

[6]The precise argument made by Ms. Hawks was raised in *State v. Sneed,* No. 03C01-9605-CC-00195, 1996 WL 512094 (Tenn. Crim. App. Sept. 4, 1996), wherein the defendant's license had been revoked for one year in 1991 as a consequence of his conviction of first offense of driving while intoxicated.  He was given a citation for driving on a canceled license in 1994, "some twenty-seven months after his driving revocation had expired." *Id*. at *1.  In a petition for post-conviction relief, the defendant alleged he should have been charged with driving without a valid license rather than driving on a canceled or revoked license.  The appellate court did not reach that issue.

Additionally, just as a resident's license is not automatically restored at the expiration of the revocation period, see generally Tenn. Code Ann. § 55-50-502, the suspension of a nonresident's privilege to operate a motor vehicle on the highways of this state "does not automatically spring to life at the end of the period of ineligibility, as if the order never had been entered . . . ." *See Colorado Dept. of Revenue, Motor Vehicle Div. v. Smith*, 640 P.2d 1143, 1145 (Colo. 1982); *see also State v. Banicki*, 933 P.2d 571, 573 (Ariz. App. 1997) (driving privileges not automatically restored). The completion of the period of revocation merely makes the nonresident driver eligible for reinstatement of his Tennessee driving privileges. *See* Tenn. Code Ann. § 55-50-502(d)(1); - (e)(3); *see also* Tenn. Op. Atty. Gen. No. 86-097 (May 19, 1986) ("[o]nce a license or driving privileges have been suspended under this chapter, the motorist may restore his privileges by satisfying certain requirements which usually include the payment of a restoration fee.")

. . . the proof introduced revealed that the Appellant's driving privilege in this state was suspended. Absent proof of compliance with reinstatement procedures, the evidence is sufficient to support a conviction for driving while license revoked.

*State v. Thompson*, No. W1999-01001-CCA-R3-CD, 2000 WL 1843249, at *4-5 (Tenn. Crim. App. Dec. 15, 2000) (*perm. app. denied*, recommended for publication).

Thus, a license remains revoked until it is reissued after compliance with statutory requirements. A person who drives on public roads after revocation of his or her license, but before reissuance or renewal of a license, is "driving at a time when the person's privilege to do so is canceled, suspended, or revoked" within the meaning of Tenn. Code Ann. § 55-50-504(a)(1). When the original revocation was due to a conviction for DUI, the driving privilege remains revoked "because of" that conviction.

The history of the General Assembly's actions to distinguish the offense of driving on a license revoked for conviction of specific offenses, including driving under the influence, from the offense of driving on a license revoked for any other reason, through enacting enhanced punishments for the former, also supports the Department's interpretation. *See* 1992 Tenn. Pub. Acts, ch. 722; 1994 Tenn. Pub. Acts, ch. 892. In addition to these general actions, one specific piece of legislative history is directly relevant. In 1996 the legislature amended Tenn. Code Ann. § 55-50-504 to provide for the seizure and forfeiture of vehicles used in the commission of the offense of driving at a time when a person's license is revoked for DUI. During debate on the bill which resulted in this amendment, now codified as Tenn. Code Ann. § 55-50-504(h), the sponsor stated, "There's a certain period of time after you get a DUI that you can get reinstated and get your license back and so if you're foolish enough not to go and get your license back, if you're foolish enough to have a DUI and drive on a revoked license, yes that car can be confiscated." Senator Cooper, *Discussion of Senate Bill 2594*, Apr. 11, 1996.

We conclude that on September 10, 1997, Ms. Hawks was driving at a time when her license was revoked because of her prior DUI conviction. Therefore, we agree with the trial court's conclusion that Ms. Hawks's van was subject to forfeiture under the provisions of Tenn. Code Ann. § 55-50-504(h). However, any such forfeiture must meet other legal standards.

III.

Ms. Hawks argues, and the trial court found, that the forfeiture of her van violates the prohibition on excessive fines found in the Eighth Amendment to the United States Constitution and in Article I, § 16 of the Tennessee Constitution.[7] She asserts that the forfeiture of her van is grossly disproportionate to the gravity of the offense triggering the forfeiture.

The excessive fines prohibition present in both the federal and state constitutions does not prohibit punishment. Rather, it "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Austin v. United States*, 509 U.S. 602, 609-10, 113 S. Ct. 2801, 2805 (1993). These provisions embody a historical limitation whose roots lie in reactions to abuses by royal judges in England. *See United States v. Bajakajian*, 524 U.S. 321, 335, 118 S. Ct. 2028, 2037 (1998). The basic principle was embodied in the Magna Carta itself, which required that fines should be proportional to the offense and that they should not deprive a wrongdoer of his livelihood. *Id.*

The United States Supreme Court determined in *Austin v. United States*, 509 U.S. 602, 113 S. Ct. 2801 (1993), that the Eighth Amendment's prohibition on excessive fines applied to forfeitures which are punitive, including civil *in rem* forfeitures. *Austin*, 509 U.S. at 610, 113 S. Ct. at 2806. In *Stuart v. State Dep't of Safety*, 963 S.W.2d 28 (Tenn. 1998), our Supreme Court found that the excessive fines clause of Article I, § 16 of the Tennessee Constitution was coextensive with its federal counterpart in the Eighth Amendment to the United States Constitution and, therefore, was applicable to punitive forfeitures, even though the forfeiture proceedings were civil in nature. *Stuart*, 963 S.W.2d at 34. Our Supreme Court has recently discussed its holding in *Stuart* in terms of those sanctions susceptible to analysis under the excessive fines clause:

> According to excessive-fines analysis under the state and federal constitutions, an otherwise civil sanction can become a "fine" subject to constitutional limitation when the sanction "is, at least in part, a punitive measure." *Stuart*, 963 S.W.2d at 34; *see also United States v. Bajakajian*, 524 U.S. 321, 329 n.4, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998) (noting that Eighth Amendment analysis begins with a finding that the contested sanction, though also serving some remedial purpose, is "punitive in part"). As the United States Supreme Court has acknowledged, a sanction is "punitive in part" under this analysis when it serves either retributive or deterrent purposes. *See Austin*, 509 U.S. at 610, 113 S. Ct. 2801.

---

[7]Both provisions provide that excessive bail "shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *Stuart v. State Dep't of Safety*, 963 S.W.2d 28, 34 (Tenn. 1998).

> . . . . As can be seen by our decision in *Stuart*, excessive-fines analysis can be applied even to those sanctions that primarily serve remedial purposes. *See* 963 S.W.2d at 34 (analyzing civil forfeitures).

*Chattanooga v. Davis*, 54 S.W.3d 248, 262-63 (Tenn. 2001). In determining whether the excessive fines prohibition is applicable to a forfeiture, the question is not whether the proceeding was *in rem* or *in personam* or whether the forfeiture resulted from criminal or civil proceedings; the question is whether the forfeiture was, even in part, punitive.[8] *Austin*, 509 U.S. at 610, 113 S. Ct. at 2801; *United States v. $359,500*, 25 F. Supp.2d 140, 147-48 (W.D.N.Y. 1998). Ms. Hawks's van was forfeited because of her violation of the statute prohibiting driving at a time when her license was revoked for DUI and is, therefore, punitive at least in part. Consequently, it is subject to analysis of whether it violates the constitutional prohibition against excessive fines.

Although the United States Supreme Court in *Austin* determined that civil forfeitures were subject to the excessive fines clause, the Court did not in that opinion establish or announce a test to apply in determining the constitutionality of a particular forfeiture. State courts, including the Supreme Court of Tennessee, began to fill that void. Finding that neither the U.S. Supreme Court nor any Tennessee court had established a test for determining what constitutes an excessive fine, the Tennessee Supreme Court announced its intention to define such a standard in *Stuart*, 963 S.W.2d at 35.

The Court considered excessive fines tests established in other jurisdictions, finding that those tests could generally be described in two categories: an instrumentality test and a multifactored hybrid of the instrumentality test and a proportionality test, which "essentially compares the value of the property with the gravity of the criminal conduct." *Id.* at 35. The court fully recognized that the proportionality test "makes the excessive fines analysis very fact-specific, thus providing less guidance and uniformity," but found that it also "is an effective mechanism for restraining the State, which has a strong pecuniary incentive to confiscate the most property – and the most valuable property – possible." *Id.* Finally, the court agreed that "the very word 'excessive' plainly contemplates some comparison of the fine to the conduct sought to be punished in order to determine if the fine violates the Eighth Amendment." *Id.* (quoting *Thorp v. State*, 264 Ga. 712, 450 S.E.2d 416, 418 (1994). The court held:

> Therefore, we conclude that any analysis under the excessive fines clause must include a proportionality test. Although the multifactored analysis is described in various ways, courts consistently utilize the following factors:

---

[8]As our Supreme Court has noted, "excessive fines analysis does not automatically condemn all remedial measures merely for being punitive in part, because it further examines whether the sanction is proportional to the gravity of the defendant's conduct and culpability. By making this additional inquiry into the proportionality of the fine, analysis under the Excessive Fines Clause makes appropriate allowance for those sanctions that primarily serve remedial purposes." *Davis,* 54 S.W.3d at 263.

(1) the harshness of the penalty compared with the gravity of the underlying offense;

(2) the harshness of the penalty compared with the culpability of the claimant; and

(3) the relationship between the property and the offense, including whether use of the property was (a) important to the success of the crime, (b) deliberate and planned or merely incidental and fortuitous, and (c) extensive in terms of time and spatial use.

No single factor is dispositive.

*Id*. at 35 (citations omitted).

A few months after the *Stuart* decision, the United States Supreme Court articulated a standard for application of the Eighth Amendment's excessive fines prohibition to a forfeiture: "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334, 118 S. Ct. at 2036. In applying this test, trial and appellate courts "must compare the amount of the forfeiture to the gravity of the defendant's offense." *Id*. 524 U.S. at 336-37, 118 S. Ct. at 2037-38. In considering "just how proportional to a criminal offense a fine must be" in order to withstand a constitutionality attack, the majority of the Court determined that strict proportionality between the amount of the forfeiture and the gravity of an offense is not an appropriate standard. 524 U.S. at 336-37, 118 S. Ct. at 2037. The Court's opinion rests on its fundamental holding that "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense it is designed to punish." *Id*. 524 U.S. at 334, 118 S. Ct. at 2036.

The United States Supreme Court has recently commented on the task of the courts to determine whether a punishment [in that case, punitive damages] is grossly disproportional:

We have recognized that the relevant constitutional line is "inherently imprecise," *Bajakajian*, 524 U.S. at 336, 118 S. Ct. at 2028, rather than one "marked by a simple mathematical formula," *Gore*, 517 U.S. at 575-580, 116 S. Ct. at 1589. But in deciding whether that line has been crossed, we have focused on the same general criteria: the degree of the defendant's reprehensibility or culpability, the relationship between the penalty and the harm to the victim caused by the defendant's actions, and the sanctions imposed in other cases for comparable misconduct. Moreover, . . . we have engaged in an independent examination of the relevant criteria.

*Cooper Indus. Inc. v. Leatherman Tool Group*, 532 U.S. 424, 121 S. Ct. 1678, 1684-85 (2001) (some citations omitted).

IV.

For guidance in how to apply the proportionality tests announced in *Stuart* and *Bajakajian*, we look first to how the courts in those cases applied the tests. The Tennessee Supreme Court in *Stuart* applied its test to the forfeiture of Mr. Stuart's truck[9] which had been used to further a high-volume drug transaction, and in setting out its analysis provided additional guidance:

> In considering the gravity of the offense under the first factor, several general principles guide our analysis: (1) intentional conduct is more serious than negligent conduct; (2) completed crimes are more serious than attempted crimes; and (3) violent crimes are more serious than nonviolent crimes.

*Stuart,* 963 S.W.2d at 36.

In analyzing Mr. Stuart's claims under these factors, the Court found that a high-volume drug transaction is unquestionably a grave offense. It further found that the transaction was both intentional and complete and that although drug violations are not *per se* violent crimes, violence is often part of high volume drug trafficking. *Id.* The Court provided further explanation of how to apply the factors in the test announced in *Stuart*:

> When analyzing the culpability of the claimant under the second factor, there are also certain principles that guide our analysis: (1) the claimant acquitted of an offense is regarded as the least culpable; (2) the claimant convicted of an offense is the most culpable; and (3) the claimant never charged with an offense must be presumed innocent.

*Id.*

In applying these factors to Mr. Stuart's conduct, the court found that he had pleaded guilty and was convicted for the underlying drug offenses, thus placing him in the "most culpable" category. *Id.* Having made findings regarding the gravity of the offense and the culpability of the claimant, the Court explained how the proportionality consideration was to be factored in:

> When determining the harshness of the penalty imposed under the first and second factors of the excessive fines analysis, courts should consider the monetary value of the property forfeited, particularly in light of the claimant's financial resources. A forfeiture is less likely to be excessive when the claimant has the financial ability to replace the property without undue hardship. Conversely, a forfeited vehicle may be

---

[9]Other property belonging to Mr. Stuart had been forfeited, but the Court found that property was not subject to the Excessive Fines Clause because they were proceeds of illegal drug transactions; because Mr. Stuart was never entitled to such proceeds, their forfeiture is not punitive. *See Stuart*, 963 S.W.2d at 34.

worth little, but undue hardship may still result if the claimant's family cannot afford to replace it and has no other means of transportation.

*Id.* In a footnote, the Court observed that failure to include the claimant's finances in the proportionality analysis will "generally permit forfeiture of property from persons of lesser means, while prohibiting forfeiture from persons of greater means." *Id.* n.12.

The Court found that the evidence suggested that Mr. Stuart had been spending or hiding large sums of money, that his truck was moderately expensive, and that no evidence suggested that forfeiture of the truck would impose an extreme hardship on Mr. Stuart or his family. The Court stated, "while the record does not reveal the truck's value at the time of forfeiture, it is undoubtedly dwarfed by the value of the large quantities of marijuana Stuart has admitted to smuggling into the United States." *Id.*

In applying its proportionality test to the facts in *Bajakajian*, in which the defendant had failed to report exported currency to customs, the U. S. Supreme Court found that the offense involved was punishable by a maximum of six months imprisonment and a fine of $5,000, indicating a minimal level of culpability, that the harm caused by Mr. Bajakajian's offense was also minimal, and that his action affected only one party, the U.S. Government, and in a minor way. *Bajakajian,* 524 U.S. at 337-40, 118 S. Ct. at 2038-39. The Court concluded that the forfeiture of all the money carried by Mr. Bajakajian, $357,144.00, would be grossly disproportional to the gravity of his offense because "[i]t is larger than the $5,000 fine imposed by the District Court by many orders of magnitude, and it bears no articulable correlation to any injury suffered by the Government." *Id.* at 339-40, 2039.

The U.S. Supreme Court did not include in its proportionality test any consideration of the impact of the forfeiture on the person from whom the property is taken, but noted that the respondent had not argued that his wealth or income were relevant to the proportionality determination. *See id.*, 524 U.S. at 340 n.15, 118 S. Ct. at 2039 n.15.

In the only Tennessee appellate court opinion since *Stuart* and *Bajakajian* to deal fully with the excessive fines analysis, the Tennessee Court of Criminal Appeals applied that analysis to a fine imposed by a jury under a statute establishing a minimum fine, but no maximum limit. *State v. Taylor*, No. M1999-2566-CCA-R3-CD, 2001 WL 427651 (Tenn. Crim. App. Apr. 26, 2001) (*perm. app. granted* Sept. 17, 2001). In that case, the Court of Criminal Appeals reiterated the United States Supreme Court's holding that the Constitution prohibits fines that are disproportionate to the crime committed, citing *Bajakajian* and *Solem v. Helm*, 463 U.S. 277, 284, 103 S. Ct. 3001, 3006 (1983). The court set out and then applied the *Solem* analysis which required consideration of (1) the gravity of the offense and the harshness of the penalty; (2) the fines imposed on other criminals in the same jurisdiction; and (3) sentences imposed for commission of the same crime in other jurisdictions. *Taylor*, 2001 WL 427651, at *2. *Taylor* involved a fine of $27,500, imposed as part of the sentence upon conviction of a second offense of driving on a revoked license. *Id.* at *1. The court

determined that the fine of $27,500 was inappropriate in relation to the nature and gravity of the offense.[10]

V.

Clearly, our consideration of whether the forfeiture of the van is disproportional to the conduct requires consideration of a number of factors. We must consider the gravity of the conduct which the forfeiture serves to punish. Part of that consideration is the relative seriousness of the other punishments for the offense and of punishments for similar offenses. The offense that is the basis for forfeiture of Ms. Hawks's vehicle is driving on a license which was revoked for DUI, in violation of Tenn. Code Ann. § 55-50-504(a). The Department of Safety, in an administrative hearing, made the determination she had committed the violation.[11] It is necessary, however, to examine Ms. Hawks's actual conduct and culpability as part of the proportionality assessment. Ms. Hawks's driver license had indeed been revoked as a consequence of her conviction of DUI in March of 1996. When considered as part of her punishment for that offense, the revocation, by statute and by court order, was for one year. By the time she was stopped and charged with driving on a revoked license, that mandatory revocation time had expired; she had served her punishment for the original DUI conviction.

The legislature has determined that a person who has been convicted for the first time of driving under the influence should not be allowed to drive on the public ways of this state for one year after conviction. Whether this determination is based on goals of punishment, deterrence, public safety, or a combination of the three, those goals are satisfied, in the judgment of the legislature, after that year. A person who meets the requirements for reissuance of a license may again enjoy driving privileges after that year, an indication that the legislature does not consider such persons in general a danger to the public safety. Similarly, the General Assembly has seen fit to permit persons convicted of DUI to drive in certain situations under restricted licenses. *See* Tenn. Code Ann. § 55-10-403(d).

The forfeiture herein was not based on any claim that Ms. Hawks violated the one year mandatory revocation restriction on her driving that was part of her punishment for DUI. If that were the situation, we would consider her conduct to constitute a more serious or grave offense because it would indicate a more serious disregard for the consequences of her earlier conviction. However,

---

[10]The sentencing statute authorized a fine of not less than $3000. The Court of Criminal Appeals concluded that the legislature's failure to establish a maximum fine rendered the statute *per se* unconstitutional under the prohibition on excessive fines. *Taylor*, 2001 WL 427651, at *4. One member of the panel dissented from the majority's finding of a constitutional infirmity in the statute itself on the basis that it is the sentence, not the statute, which is subject to review as an excessive fine. The dissent also favored refraining from passing on the constitutionality of a statute because such determination was not necessary to resolution of the case. *Id*. at *5-6.

[11]The record does not include any evidence that Ms. Hawks was convicted or punished by a court for the offense of driving on a license revoked for DUI. There is a statement by counsel that, in fact, she was not even charged with that offense, but was charged with driving without a license.

-13-

she was, at the time of the seizure of her van, eligible for reissuance of a license upon compliance with certain requirements. She was reissued a license two months later. Thus, at the time of the seizure, she could have been licensed but had not taken the necessary steps. That conduct was a violation of the law and subjected her to prosecution and potential criminal punishment, proceedings outside the case before us. Whether that conduct justified the loss of her vehicle is the question here.

Because Ms. Hawks was eligible for a new license, but had not obtained one, the gravity of the failure to do so is relevant to the proportionality inquiry. The record does not include, and the Department has not pointed out, any requirements for issuance of a new license to a person whose period of mandatory revocation for conviction of DUI has expired that are different from the requirements for a new license for anyone else who has become eligible after revocation.[12] In other words, there are no special requirements for a new license directed solely to the person whose license was revoked because of one DUI conviction.[13] Although the Department is under a directive not to "issue a new license unless and until it is satisfied after investigation of the character, habits and driving ability of such person that it will be safe to grant the privilege of driving a motor vehicle on the public highways," Tenn. Code Ann. § 55-50-502(f)(3) (formerly § 55-50-502(e)(3)), the Department has not provided us with any information regarding the criteria it applies in such situations or argued that those criteria are more stringent for persons whose license was originally revoked for one DUI conviction. Ms. Hawks passed the investigation by the Department two months after the seizure of her vehicle, and the Department has presented no evidence or argument that she would not have passed the investigation before the seizure.

Therefore, we are unable to discern any public policy determination that more stringent requirements are necessary for reissuance of a license to a person who has completed one year of mandatory revocation because of one DUI conviction than for reissuance to others whose licenses have been revoked for other convictions. Accordingly, we discern no basis for deciding that failure to take the steps necessary to obtain a new license is a more serious offense for someone in Ms. Hawks's situation than for others who are found to have driven while their license was in a revoked status.

In arguing the gravity of the offense committed by Ms. Hawks in failing to have a new license issued before driving, the Department relies heavily on the importance of compliance with the State's financial responsibility law as a prerequisite to issuance of a new license after

---

[12]When a license is suspended or revoked because of a conviction (of various offenses), proof of financial responsibility, passage of driver license examination, and payment of a restoration fee are required as conditions precedent to restoration of any license. Tenn. Code Ann. §§ 55-12-114 and -116. "Any person convicted of driving on a revoked license pursuant to § 55-50-504, when the original suspension or revocation was made for a violation of an offense not requiring mandatory revocation" are required to pay a lower restoration fee. Tenn. Code Ann. § 55-12-114(c).

[13]After a second or subsequent conviction for DUI, however, prior to reissuance of any revoked license, the Department must require evidence of completion of alcohol or drug abuse education or of treatment. *See* Tenn. Code Ann. § 55-50-502(c)(1).

revocation.[14] The relevant statutes, however, do not support a conclusion that such conduct after expiration of the mandatory revocation period is more serious when the license was originally revoked for a DUI conviction. A person whose license has been revoked because of a "conviction" must provide proof of the requisite financial responsibility,[15] and maintain that responsibility for three years, in addition to paying a restoration fee and passing the driver license examination as conditions to restoration of a license. Tenn. Code Ann. § 55-12-114(c). However, a conviction which triggers these requirements for restoration of driving privileges is not limited to driving under the influence. Instead, any suspension or revocation by the commissioner, under any law of this state authorizing such suspension or revocation by reason of a conviction, is included, as well as failure to satisfy a citation, refusal to submit to a drug or alcohol test, and forfeiture of security for appearance in court. Tenn. Code Ann. § 55-12-113 and -114. In any event, the Department has not shown that Ms. Hawks was not in compliance with the financial responsibility requirements at the time she was stopped, and the Department found she was in compliance when it reissued her license two months later.

In the analysis of the gravity of the offense, the other penalties authorized for the offense committed are relevant and should be considered. *Bajakajian*, 524 U.S. at 339 n.14, 418 S. Ct. at 2038 n.14. As a general rule, the offenses created in Chapter 50 of Title 55 of Tennessee Code Annotated are Class B misdemeanors. "Any person violating any of the provisions of this chapter for which punishment has not been hereinabove provided commits a Class B misdemeanor." Tenn. Code Ann. § 55-50-603. The statute creating the offense of driving when that privilege has been revoked specifically states that such offense is a Class B misdemeanor. *See* Tenn. Code Ann. § 55-50-504(a)(1).[16] A Class B misdemeanor is punishable by confinement in jail for up to six months and/or a fine of up to $500. Tenn. Code Ann. § 40-35-111(e)(2).

The offense of driving on a license which has been revoked because of a conviction for vehicular assault, vehicular homicide, or driving while intoxicated is subject to a specific penalty: confinement of not less than two days nor more than six months and a fine of up to $1,000. Tenn. Code Ann. § 55-50-504(a)(1). Thus, the two offenses can be punished by the same maximum

---

[14] Tennessee's financial responsibility statutes are intended to provide an effective means of enforcing payment of automobile-caused damage claims. *Burress v. Sanders*, 31 S.W.3d 259, 263 (Tenn. Ct. App. 2001). Generally, motorists involved in serious accidents are required to prove their ability to pay damages or face the loss of their driving privileges. *Id*.

[15] The Tennessee Financial Responsibility Law, Tenn. Code Ann. §§ 55-12-101 *et seq.* establishes requirements, including liability insurance, cash deposit, or bond in stated amounts, for the purpose of protecting victims of personal injury or property damage resulting from a vehicle, from financial loss. Interestingly, persons who violate a number of the specific requirements of that chapter subject their driver licenses to revocation or suspension. *See, e.g.,* Tenn. Code Ann. § 55-12-108, 115-118, 134-135. Violations without specific penalties are punishable as Class A misdemeanors *see* Tenn. Code Ann. § 55-12-135(b), and driving on a license which has been revoked for failure to comply with the Financial Responsibility Law is a Class B misdemeanor. *See* Tenn. Code Ann. § 55-12-131.

[16] *See also* Tenn. Code Ann. § 55-12-131, which makes the offense of driving while a license is revoked for failure to comply with various requirements in the financial responsibility laws a Class B misdemeanor.

-15-

incarceration, and the primary difference is the mandatory two-day incarceration when the license was originally revoked for one of the enumerated offenses. A higher maximum fine is also available. Neither of these differences, however, removes the offense from general categorization as a mid-range misdemeanor. In *Bajakajian*, the U.S. Supreme Court found that the fact that the offense involved was punishable by a maximum of six months imprisonment and a fine of $5,000 indicated a minimal level of culpability as a factor in the proportionality analysis. *See Bajakajian*, 524 U.S. at 338-39, 118 S. Ct. at 2038.

Even within the set of statutes governing driving licenses, the legislature has determined that other offenses, though still misdemeanors, are more serious than the one committed by Ms. Hawks. For example, it is a Class A misdemeanor to operate a vehicle in violation of any condition imposed by the Department in a conditional license. Tenn. Code Ann. § 55-50-331(f). Similarly, violation of various provisions of the Financial Responsibility Act are Class A misdemeanors.

We also consider relevant whether violation of other driving or driver license related offenses can result in forfeiture of the offender's vehicle. The statute authorizing forfeiture of Ms. Hawks's vehicle applies only to persons who operate a vehicle at a time when their licenses are in revoked status, having initially been revoked because of a conviction for driving under the influence of an intoxicant. It does not authorize forfeiture of vehicles being driven by persons whose licenses are in revoked status when the initial revocation was for any other reason, including conviction of vehicular assault or vehicular homicide, both felonies and, thus, considered graver offenses.[17]

Similarly, conviction of the offense of DUI for the first time does not carry with it the possibility of forfeiture of the vehicle involved.[18] First offense DUI is a Class A misdemeanor, Tenn. Code Ann. § 55-10-403(m), making violation subject to the harshest penalty available for a misdemeanor. It is also a poses a serious threat to the public safety. Recognizing this threat, the General Assembly has enacted laws designed to "remove from the highways, prosecute and punish those who engage in the dangerous menace of driving under the influence." *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995).

Further, a second violation of driving on a revoked license is a Class A misdemeanor; however, forfeiture of the vehicle involved is not authorized unless the original revocation was due to a DUI conviction. From these examples, it is clear that driving and license offenses considered more serious by the legislature and subject to harsher criminal penalties do not carry the risk of forfeiture of the vehicle.

---

[17]The statute requires the two day incarceration and authorizes the greater fine upon conviction for driving at a time when the license was revoked due to a conviction for vehicular assault under § 39-13-106 or vehicular homicide under § 39-13-213, the same treatment given conviction for DUI under § 55-10-401. Tenn. Code Ann § 55-50-504.

[18]The vehicle used in a second or subsequent violation of driving under the influence of intoxicants, is subject to forfeiture in circumstances described by statute. Tenn. Code Ann. § 55-10-403(k).

The Court of Criminal Appeals has analyzed the relative gravity of the offense of driving on a revoked license, second offense, as follows:

> Driving on a revoked or suspended license, second offense, is graded by our legislature as a class A misdemeanor. *See* Tenn. Code Ann. § 55-50-504(a)(2) (1998). The offense is neither a violent offense nor an offense against a person. Rather, the offense reflects the legislature's prerogative to sanction a penalty against persons for violating a previously imposed driving restriction. The legislature has authorized a fine of "not less than three thousand dollars" for a second infraction of this misdemeanor offense. *See* Tenn. Code Ann. § 55-50-504(a)(2). The disparity between the nature of the offense and the fine imposed, at a minimum, suggests a lack of proportionality in the sentence.

*Taylor*, No. 2001 WL 427651, at * 2 (footnotes omitted).

The court also compared the fine imposed for the offense of driving on a revoked or suspended license, second offense, with fines imposed for the commission of other crimes in the State of Tennessee. After discussing the fines generally available for class A misdemeanors, for a first offense of driving on a revoked license, and the graduated fines for the first and subsequent violations of the more serious offense of driving under the influence, the court concluded that "A fine imposed for a second offense driving on revoked, a class A misdemeanor, therefore, has the potential, as no statutory maximum limit to the fine exists, to surpass fines imposed for similar but more serious offenses," including serious felonies. *Id*. at *3.

We agree with this analysis. Applying it to the facts of the case before us, which involves a first, rather than second violation, and one that occurred while the driver was eligible for a new license, we conclude that the forfeiture of the vehicle herein was grossly disproportionate to the gravity of the conduct which was the basis of the forfeiture. The offense was a midrange misdemeanor, subject to a maximum fine of $1,000; the conduct was neither violent nor dangerous to the public; other vehicle and licensing related offenses, carrying more severe penalties, do not subject offenders to the risk of forfeiture of their vehicles.

The Department argues that the General Assembly has viewed the offense of driving on a license revoked for DUI as "quite severe" and has, in the past decade, increased the potential penalty for that offense, as well as the offense of driving on a license revoked for conviction of other specified vehicular crimes. While the legislature has, as set out above, provided separate specific criminal penalties available upon conviction for these offenses, the degree of enhanced severity of punishment, as compared with the offense of driving on a license revoked for any other reason, is minimal. There is no indication that the legislature intended to remove driving on a license revoked for a DUI conviction from its classification as a midrange misdemeanor, or even to subject it to potential maximum punishment as great as other license related offenses.

The fact that the General Assembly added potential forfeiture of the vehicle involved as a penalty for driving on a license revoked for conviction of specific offenses cannot be used in analyzing the gravity of the offense. Obviously, legislative authority making the property subject to forfeiture is necessary to provide jurisdiction to the forfeiting agency. *State v. Thompson*, No. 03C01-9703-CR-00105, 1998 WL 221052, at *5-6 (Tenn. Crim. App. May 6, 1998) (no Tenn. R. App. P.11 application filed) (the terms of the statute must manifest the legislature's intent to authorize forfeiture). Unless such statutory authority is present, there is no need to conduct an individualized excessive fines analysis. To argue that the legislature's enactment of a forfeiture provision for a particular offense elevates that offense to a gravely serious one amounts to an argument that the forfeiture cannot be excessive because the legislature authorized it. Such an argument disregards the directives of both the United States and the Tennessee Supreme Courts and the effect of the constitutional prohibition on excessive fines.

Legislatures have extremely broad discretion in defining criminal offenses and in setting the permissible range of punishments for each offense. *Schall v. Martin*, 467 U.S. 253, 268-69 n.18, 104 S. Ct. 2403, (1984); *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009 (1983). However, as the United States Supreme Court noted in *Bajakajian,* an authorization of forfeiture "cannot override the constitutional requirement of proportionality review." *Bajakajian*, 524 U.S. at 339 n.14, 118 S. Ct. at 2038 n.14. Thus, it is left to the courts to determine whether a particular forfeiture violates the constitution under the individual facts of that case, even where the legislature has granted general authority for such forfeitures. We note that Tenn. Code Ann. § 55-50-504(h) makes no distinction between persons driving while still subject to the one year mandatory revocation part of their sentence and those driving when they are eligible for a new license. As we stated earlier, disregard of a court order prohibiting driving and disregard of the mandatory one-year revocation required by statute as part of the criminal sanctions for conviction constitute, in our opinion, more egregious conduct. It is left to the administrative decision makers to make the first decision as to whether the particular conduct warrants the harsh consequence of forfeiture. It is the role of the courts to review that decision for constitutionality.

The Department also argues that the gravity of the offense involved is demonstrated by legislation dealing with intoxicated drivers. We are aware of and share the General Assembly's concern over the tragedies caused by persons who drive while under the influence of intoxicants, and we recognize its efforts to reduce those tragedies. Among the measures enacted to punish and deter driving under the influence of intoxicants are increased criminal penalties, including increasing severity for repeat offenders.

The penalties for persons convicted of driving under the influence of an intoxicant, in violation of Tenn. Code Ann. § 55-10-401, include, for the first offense, a mandatory fine of at least $350.00 with a maximum of $1,500.00, and confinement in jail for not less than 48 hours nor more

than eleven months and twenty-nine days.[19] Tenn. Code Ann. § 55-10-403(a)(1). A first conviction does not authorize forfeiture of the vehicle. Only upon a second or subsequent violation of Tenn. Code Ann. § 55-10-401, or similar driving under the influence statute in another state, does the vehicle used in the violation become subject to seizure and forfeiture. Tenn. Code Ann. § 55-10-403(k). The General Assembly has explained its reasons for authorizing such seizure and forfeiture:

> It is the specific intent that a forfeiture action under this section shall serve a remedial and not a punitive purpose. The purpose of the forfeiture of a vehicle after a person's second or subsequent DUI violation is to prevent unscrupulous or incompetent persons from driving on Tennessee's highways while under the influence of alcohol or drugs. Driving a motor vehicle while under the influence of alcohol or drugs endangers the lives of innocent people who are exercising the same privilege of riding on the state's highways. There is a reasonable connection between the remedial purpose of this section, ensuring safe roads, and the forfeiture of a motor vehicle. While this section may serve as a deterrent to the conduct of driving a motor vehicle while under the influence of alcohol or drugs, it is nonetheless intended as a remedial measure. Moreover, the statute serves to remove a dangerous instrument from the hands of individuals who have demonstrated a pattern of driving a motor vehicle while under the influence of alcohol or drugs.

Tenn. Code Ann. § 55-10-403(k)(3).

However, Ms. Hawks's vehicle was not seized from her and forfeited because she was driving under the influence of intoxicants. Ms. Hawks was not driving under the influence, and the forfeiture is not based on such allegation. She was not a repeat offender and, thus, not in the class of "unscrupulous or incompetent" persons the above forfeiture statute was designed to protect against.

The United States Supreme Court and the Tennessee Supreme Court have directed us to consider the culpability and conduct of the offender and the reprehensibility of that conduct. Ms. Hawks's testimony at the administrative hearing establishes that she knew she was driving without a valid license and that her license had been revoked because of her DUI conviction.

> I knew my license were revoked. The year was up, but I just hadn't had the money to get them back. And at that time I had been living in the projects for a few months and was really trying my best to get out of the projects. And I got a job offer making really good money . . . , and I knew I didn't have any license when I started driving out there. But I thought, well, you know, this is my ticket to get out of the projects, get my license back, move to a better neighborhood, a decent apartment for me and my children.

---

[19] In certain counties, the minimum mandatory incarceration may be replaced by 200 hours or public service. *See* Tenn. Code Ann. § 55-10-403(n).

Just as we considered the fact that Ms. Hawks was statutorily eligible for reissuance of her license at the time of her offense as lessening the gravity of the offense, we also consider that fact relevant in assessing her culpability, as did the trial court. She admittedly drove at a time when her license was still in a revoked status, but she did not violate the one year prohibition. She is, therefore, most culpable of failing to comply with the requirements for obtaining a new license.[20] The record before us does not allow us to conduct the culpability assessment using all the factors set out in *Stuart* because the record does not contain any information regarding Ms. Hawks's criminal prosecution.[21] However, the record does not indicate that she was involved in any other criminal activity. She was not using the vehicle to further an illegal money-making enterprise. She was not found to have violated the one-year restriction imposed on her driving as a result of her prior misdemeanor conviction. She was not operating the vehicle while under the influence of intoxicants. Taken as a whole, her conduct is not particularly reprehensible when compared with other violations of the law.

V.

Following the guidance of the United States Supreme Court in *Bajakajian*, we find that Ms. Hawks's offense was primarily failing to take the steps necessary to have her license reissued. Just as Mr. Bajakajian would have been lawfully permitted to transport the currency in his possession had he reported it, Ms. Hawks would have been lawfully permitted to drive had she applied for and received her license before she recommenced driving. She was reissued her license shortly after the offense triggering the forfeiture. We find no relationship between this offense and any other criminal activity. The maximum criminal penalty that could have been imposed for the offense was six months confinement and $1000 fine. The *Bajakajian* court found that a potential maximum penalty of six months imprisonment and a fine of $5000 confirmed a minimal level of culpability. *Bajakajian*, 524 U.S. at 338-39, 118 S. Ct. at 2038.

---

[20] In addition to the fees set out in Tenn. Code Ann. § 55-12-114(c), a person obtaining a new or reinstated license when proof of financial responsibility is required must also pay the fees set out in Tenn. Code Ann. § 55-12-129. In apparent recognition of the barrier presented by this combination of fees required to obtain a new or reinstated license after revocation, the General Assembly has authorized reinstatement of a license on an installment payment plan, effective January 1, 2001. Tenn. Code Ann. § 55-12-129(g). This option was not available to Ms. Hawks. Also, Tenn. Code Ann. § 55-30-303(b) requires payment of all costs and fines in the trial court before driving privileges may be reinstated when a condition has required revocation.

[21] Although the trial court noted that Ms. Hawks was only charged with driving without a license, we are unable to find any reference to the criminal proceedings except that contained in a Motion for Reconsideration filed with the Commissioner of Safety by Ms. Hawks's counsel after the final order of forfeiture. That Motion recites that "when the speeding and driving on a revoked charges were brought before the Court for disposition, the speeding charge was dismissed and the driving on a revoked was lowered to driving without a license on her person," an offense for which forfeiture is not available. Pleadings, however, are not evidence, and no evidence regarding the disposition of the criminal charges was introduced at the administrative hearing, where Ms. Hawks was unrepresented. As the trial court also noted, Tenn. Code Ann. § 55-50-504(h)(2) is explicit that a conviction is not required. Forfeiture is triggered by arrest or citation for driving on a revoked license, and the Department must prove that the person drove while his or her license was revoked for DUI.

The Court in *Bajakajian* also found that minimal harm was caused. The only party affected by his conduct was the government, which the Court found only would have suffered deprivation of information that money was leaving the country. *Id.* 524 U.S. at 339, 118 S. Ct. at 2039. In Ms. Hawks's case, the only party harmed was the Department, which was deprived of its ability to investigate her fitness for a license and of its reinstatement fees, albeit only for a few months. Finally, the Supreme Court found that the $357,154 forfeiture in *Bajakajian* bore no articulable correlation to any injury suffered by the government and that it exceeded the maximum potential fine "by many orders of magnitude." *Id.* 524 U.S. at 340, 118 S. Ct. at 2039. We are unable to draw the same conclusions in this case, primarily because we are unaware of the value of the forfeited van, but it is unlikely that the van's monetary value exceeded the maximum fine of $1000 by many orders of magnitude. However, the exact conclusion as that reached by the *Bajakajian* court is not necessary. We find no correlation between the forfeiture of the van and any injury sustained by the Department or by the police department which seized it.

Based upon our conclusions regarding the relative gravity of the offense which is the basis for the forfeiture and the culpability of Ms. Hawks, we are convinced that in view of all the facts in this case, the forfeiture of the van is an excessive fine and, therefore, prohibited by the Constitutions of the United States and of Tennessee.[22]

We affirm the trial court. Costs are taxed to the appellant, Michael C. Greene, Commissioner of Tennessee Department of Safety.

_____
PATRICIA J. COTTRELL, JUDGE

---

[22]Because we consider the other factors dispositive under *Bajakajian*, we have not analyzed harshness of the forfeiture to Ms. Hawks and her family, as provided in *Stuart*. As the court stated in *Stuart*, "a forfeited vehicle may be worth little, but undue hardship may still result if the claimant's family cannot afford to replace it and has no other means of transportation." *Stuart*, 963 S.W.2d at 36. The record indicates that Ms. Hawks had little income, few assets, and lived in a subsidized housing project with her four children. Her monthly income was $264, and her net worth was $2000. The trial court found that "the petitioner did not have the financial ability to replace the forfeited vehicle without undue hardship." The evidence supports that finding.